Good morning, Mr. Rolfing. It's good to see you. Good to see you too, Judge. You may proceed. Thank you. May it please the Court, Morris Rolfing on behalf of Ms. Garcia. This case starts with Dr. McDonald not finishing the Wechsler Adult Intelligence Scale because Ms. Garcia was too slow to finish the test. And so the part of the test that she did complete, she got a seven. We have an unpublished disposition. Pardon? We have an unpublished disposition. And I know how fond you are of unpublished dispositions. Well, we say that's okay. The government's brief relies on that. Yes. And as you know, we're not bound by that. But they're not citable. We'll service Andrade. So why don't you tell us why we shouldn't follow that? It's directly on point, right? It seems to say that you don't have to complete the test. And I assume it's Andrade, Ninth Circuit, not Andrade District Court. Andrade, Ninth Circuit, Judge McNeil's panel. The difference is that Mr. Andrade had a work history. Ms. Garcia had a history of childhood disability. Mr. Andrade stopped working. Ms. Garcia shifted from childhood disability standard to an adult disability standard. The difference between the two, if someone has a positive work history of successful work, the ALJ and the agency will generally assume that the person had a functional level above the mentally retarded range at age 22. And something else may have happened later, but there isn't an ability to find a lower IQ all the way back to age 22. And so that's the problem with Andrade. Ms. Garcia was tested with an IQ of performance IQ of 74, verbal IQ of 60, low 60s, and a full-scale IQ of 66 while she was a child. The regulations tell us that we no longer assume that childhood IQ scores apply to the adult scores. We see that drift upward in this case because Dr. McDonald finds an IQ of 77, which is only four points higher than the performance IQ that was found during her childhood. But you're seeking relief under 12.05C and D of the listing. You're not seeking relief under 12.05B of the listing. Am I correct on that? Because the difference there is that Section 12.05C and D require not just the result of the test scores, which let's just say they're problematic. Let's just go with that. There's also some additional showings that need to be made. And I guess the problem I'm having is where are those additional showings, and could you ever make those additional showings, and have you shown anything down below or in your brief now that support those additional showings that are required under 12.05C and D? Your Honor, as I look at Ms. Garcia's record and I ask could she conceivably meet 12.05B or C or D, I don't know. Well, you didn't seek 12.05B relief down below. You didn't say, hey, these tests are problematic because we're not able to make 12.05B. You have relied, from what I can tell, and you tell me if I'm wrong, on 12.05C and D. And let's just say, like I said, the test scores, the way they were handled here or in Andrade, or in addition to Andrade, were suboptimal and problematic. But ultimately, I'm just trying to figure out how relevant is that if you can't make the additional and fail to make the additional required showings. That's another difference between this case and Andrade is that Andrade only made a listings argument. And in this case, Ms. Garcia makes a listings and a residual functional capacity argument. And if Ms. Garcia has an IQ of, taking my best professional guess at it, 65 verbal, 69 full scale, the question is whether those kinds of scores would not only implicate 12.05C or D, but also implicate residual functional capacity, because we know that without those two additional scores, the two State agency physicians stated that she could perform and sustain simple one and two-step instructions. And so a large part of this administrative practice is going to hearings and not knowing what the evidence is going to show until we've heard it, asking for evidence to be procured, asking the ALJ to purchase a second psychological evaluation, not knowing what it's going to show. And so the kind of request that is made in these types of cases is the kind of request that should have been made here that the ALJ should have so espontaneously engaged in just to order the rest of the test to be completed, because it implicates not only 12.05C and D, probably not D, maybe C, but also residual functional capacity. Well, how does the fact that, and maybe it doesn't, but didn't you concede, or Ms. Garcia conceded that she could be a bagger? I mean, does that not affect the residual functional capacity result here, if there was a concession down below, that Ms. Garcia could be a bagger? It was conceded that she could be a bagger if she was limited to simple one and two-step instructions, because that's the way the Dictionary of Occupational Titles classifies that work. But if we start in the sequential evaluation process at step three and get all of the evidence that the record cries out for, which is the completion of the verbal portion of the IQ and the scoring of the full-scale IQ, this is on a now outdated version of the WACE, to get that evidence and then follow the sequential evaluation process down, because they're all interrelated. There are connections between two and three and four in the medical part of the medical vocational analysis that require a complete development of the record at step three. I don't know what Ms. Garcia's intelligence level is, so that I could properly frame a question to a vocational expert about her ability to engage in the mental requirements of work, because she's too slow to finish the test. Well, what about the IQ determination of 77? Where does that fit in your analysis? The IQ of 77, that's her performance IQ. It's in the borderline range. But it's not between 60 and 70. Absolutely not. But the commissioner tells us that all three scores are equally important, not just the performance IQ, but the verbal IQ and the full-scale IQ are all equally important. And to isolate one without reference to the other two is inappropriate as a matter of law because the commissioner tells us that. And there's no verbal IQ determination here? There's no verbal IQ determination as an adult. We have hints of what her verbal IQ would be in the Wexler memory scales. They tell us that her verbal IQ is going to be less than her performance IQ, but we don't know that because the testing isn't done. We need to send this case back and have the proper testing done so that we can assess whether or not she needs her equals 12.05C in light of this court's decision last month in Kennedy v. Colvin. And then to proceed with the sequential evaluation process at step four and five. Okay. Thank you. I'll reserve my five minutes and 20 seconds. We'll hear from the government. Good morning, Your Honors. Anna Anderson for the Commissioner of Social Security. As the panel has indicated, this case with respect to the issue of Dr. McDonald's report is and should be controlled by the decision in Andrade. Andrade is not published. Yes, Your Honor. Yes, Your Honor. But it was appellant who introduced Andrade in the opening brief. It was appellant who related Andrade to this case. Well, maybe so, but so what? Why don't you persuade us that it's right? I don't get it. I mean, the Commissioner says you've got to have the three scores. Dr. McDonald seems to be doggedly opposed to it. I don't get it. Why shouldn't we set this back and have Dr. McDonald do what he's supposed to do? He seems to like to get paid, but he doesn't seem to like to do the work. Why shouldn't we? It's a she. What's a she? It's a she. Same guy. Why shouldn't Dr. McDonald be required to do the work that she gets paid for? Because, Your Honor. Or find somebody who does. I don't get it at all. At step three. But is this close enough for government to work? Is this the excuse? Your Honor, at step three, it's not only the scores that are important to the determination of a presumptive disability. They're also basically the bulk of the record. So you can do without the scores? Why bother having a test at all? Well, Your Honor, the regulations indicate that customarily you would have three, but the regulations also foresee the possibility that you would not. And therefore, they rely on one to make that determination. Well, the listing for mental disorders makes it very clear that this kind of partial listing is inappropriate. It specifically identifies the Weschler test administered by Dr. McDonald, the test which verbal performance and full-scale IQs are customarily derived. And I think it's section 20 CFR section 416.919NB tells us that the reported results of examinations must conform to accepted professional standards and practices in the medical field for a complete examination. So how was it acceptable for the Social Security Administration to accept partial IQ test results that failed to conform with the standard reporting practices under the regulations? Well, Your Honor, what I can say is that even given, if let's say that she met the, those listings, let's say that she had the scores, but the other scores were lower, and within the area of 60 to 70, then she still would have to show the B part of 105.C. She would still have to have those other. And I understand that. But it's still very troubling and disconcerting that the Social Security Administration is doing nothing to make sure to meet the obligations that they themselves have listed are the requirements that should be met. Your Honor, I can't tell you that we're doing nothing. I can only tell you what we have in this particular record. Well, we have a pattern here with Dr. McDonald. You need, I mean, is that not true? I mean, we have the exact same thing and the exact same language was used as in Andrade. Two cases which, yes, Your Honor, we see that. It takes two points to make a line, you know. So why don't we just send this back and have you guys do it right, and tell Dr. McDonald that she's not to do this anymore if she wants to get paid, and maybe dock her for the time that she's done this without. What is the possible excuse for this? I don't understand it. I'm sorry. I don't understand. What is the possible excuse for this? What is the possible excuse for accepting or for doing work that's incomplete, for submitting work that's incomplete, and for the government accepting it? What is the possible excuse for this? Well, her indication in this particular case was that it was taking a long time for the claimant to finish the test. But she didn't even take the time it would have taken for somebody to complete the test in normal time. She took 60 minutes. I mean, she didn't take 90 minutes. She didn't spend that much time. But so what? I mean, if she's slow, she's slow. Were there some findings, some indication that she was malingering or that she was delaying in order to sort of pretend she's slow? I mean, there was no determination like that, right? There's nothing like that in this record, Your Honor. But what I can tell you is that two other doctors have looked at these results and indicated nonetheless that she did not meet the listings. Well, how do you get around the regulations? The regulations seem to say that you need the three scores, right? Is there something? You said the regulations somehow excuse it. But I don't see where it is in the regulations. Well, it uses the word customarily. Why don't you give me a cite, like a section? What are you talking about? I'm sorry, Your Honor. I can't do that right now. I can provide it to you in a. . . You don't have a citation to the. . . I'm sorry. There you go. I knew you wouldn't be too far from your regulations. This is exactly what we're not supposed to be doing. What are you not supposed to do? Fumbling through books. There are no arguments. Well, it's better than not having any books at all.  But you don't. I don't have any books at all. I mean, you could pull it out and read it all I am, but not. . . What section? Oh, I'm sorry. I think I should be looking at. . . Talk into the mic. Oh, sorry. You should be looking at the preamble 1200. . . 1200. . . Is it? 6A. Where it says it's standardized. Okay. A citation starts with a number. I'm sorry. It's a 20, probably, CFR in a section. So why don't you start with a 20? 20 CFR Part 404, Subsection P, Appendix 1. Okay. I'm with you. I got it in front of me. Now, where are you reading? At 1200, Mental Disorders. Okay. There are two columns. There's an A. 1200. What's the page number at the bottom? Well, if you're looking at the 2013 version, it would be beginning at page 508 and going over to 509. Okay. Hold on. Let me get there. Okay. Okay. Five, Psychological Testing. Keep going. And it says that basically, although. . . No, not basically. The basically is not in there. When it says it says, I want a quote. I want you to tell me where it is and what it says. The results of standardized intelligence tests may provide data that. . . I'm sorry. Where are you reading from? Bottom of page 508. Okay. Which paragraph? Six, small A. Okay. The results of standardized intelligence tests may provide data that help verify the presence of mental retardation or organic mental disorder, as well as the extent of any compromise of cognitive function. However, since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test should comment on whether the IQ scores are considered valid and consistent with the development history and the degree of functional limitation. So, although. . . How does that help you? Well, although. . . Okay. Although scores are important, they are not the complete picture. That's right. They're not enough. They're not enough? They're not enough. It says you need more than that. It doesn't say you need less than that. Yes. You're right. Okay. Is that your best shot? That's all I have right now. Okay. Thank you. Shall I continue? Well, you said you don't have anything else, so I don't know what. . . If you want to stand there for five minutes, look at that. That's fine, but. . . Well. I thought you said that's all you've got. Let me just ask a little farther down. It's section 12 or subsection. It's 12.05, and then there's an A and a B, and then you have C and D. Yes. Where does that fit in this, in your view? The reason I raise that is because counsel is relying on it. The customarily language that I was talking about is in the C, where it says that basically. . . Basically.  Well, this section. . . It says a valid verbal performance or full-scale IQ of 60 to 70 and a physical or mental impairment imposing as an additional and significant work-related limitation of function. That's correct. Are you relying on that? That's correct, Your Honor, because there is no additional physical or mental limitation that imposes a significant work-related limitation. Yes, but they're saying that's because the tests weren't completed. Well, that's not the case, Your Honor. The alleged additional mental or physical limitation is depression, and the record is clear that the depression, the alleged depression, which was postpartum depression, which doesn't last forever, if not completely ameliorated, was significantly and adequately treated with medication. In fact, claimant at a transcript or certified administrative record, page 510, indicated that she is very functional on her medications. With respect to the customarily language is on page 509. In cases where more than one IQ is customarily derived from the test administered, we use the lowest of these in conjunction with 1205. So like I was saying. No, actually, this contradicts what you were saying. It says if you have more than one, you use the lowest. How do you know what the lowest is if you have only got one, if you haven't got the other two? It actually contradicts what you were trying to say. And, Your Honor, what I was also saying is that if, as Judge Murguia said, we assume that there are lower scores, you still, for 1205C, need to have that additional impairment, creating a significant issue. Right. So Mr. Rolfing says I can't develop the record of that because I don't have that low IQ. I can't really phrase a question to the expert saying, assume you have somebody with an IQ of 55 or verbal IQ of 55. I can't develop the record because I don't have those scores, which are required. What's your answer to that argument? Well, Your Honor, I mean, it is a Step 3 decision, which means it was a claimant's burden. He has a right. Fine. I can't have a burden, but the government needs to do what it's required to do. Then I'll take those tools. I'll develop the record further. But I don't have the tools because they didn't complete the testing. That's his argument. I mean, I don't know. I think I heard him stand there and say, so I figured you probably have an answer to that. What is your answer? No answer. Okay. Your Honor, I would also like to, in addition to Andrade, cite to this court's decision in Lara. Is that in your brief? With respect. Is that in your brief? No, it is not. This is subsequent authority? Yes. Okay. Did you file a Rule 28J? I didn't, but I have one. Did you inform opposing counsel? I just drafted it this morning, so no, I did not. Then you can't talk about it, can you? It's not really fair to him, is it, for you to spring authority? Did you only learn? When was this case decided? When was this case decided? Lara was decided some time ago, Your Honor. And you must have known about it if you drafted it this morning. You must have known about it earlier. Did you call counsel and say, hey, I want to talk about Lara? Actually, I apologize. I just found out about Lara yesterday. Okay. Well, there was time between yesterday and today. You know how to get a hold of opposing counsel and say, look, I've got a case I want to talk about. Right? You know how to do that. Yes, Your Honor. Okay. Thank you. Thank you. I just very briefly wanted to answer the question about whether Ms. Garcia put forth good effort. Dr. McDonald said that she was cooperative and that the test results were an accurate assessment of her functioning, including her memory functioning and a part of the weights that she did perform. So in order to accurately and fully develop the recognition in this pattern, complete the weights, and complete the sequential evaluation process through step five with a complete record. Well, what happens if you have an applicant who is dragging her heels? I'm not saying your client is, but a doctor is there trying to administer an IQ test and discovers there's heel dragging or, you know, determines she's not really working at this very hard. I've got limited time. I've got other patients. So what's practically what's supposed to happen? And I realize there's no finding of that here, but I'm just wondering. As a practical matter, Your Honor, what happens is the doctor will state in the report that the person was dragging their heels, was intentionally slowing the process down, that they were feigning slowness, and then the administrative law judge will make a credibility finding based upon the fact that the person was interfering with the examination process and trying to manipulate the doctors. These doctors are professionals. They're in tune to the proposition that claimants can come in there and feign slowness. And so they make comments like that, and those cases die at the administrative hearing level because it's very difficult to prove disability for someone that's obviously malingering. And there was no such comment or determination here? I didn't see any. No. No finding of malingering. And no suggestion from Dr. McDonald that she was manipulative. Okay. Thank you. Thank you. Cases, I will stand submitted. We are now adjourned.
judges: Kozinski, O'scannlain, Murguia